CATHARINE SHORTEL, APPELLEE, v. ANDREW YOUNG ET AL., APPELLANTS.

1. **Creditor's Bill.:** HUSBAND AND WIFE : RIGHTS OF WIFE. Where a wife purchased a tract of land for the sum of two thousand dollars, and made a payment thereon of two hundred dollars, which was obtained from a married son, who testified that he raised the money from the sale of hogs and wheat from his own farm, the court will not infer fraud in the transaction from the fact that a year previous the husband and father had sold to the son certain personal property, including hogs, particularly where a creditor living in the same county treated such sale as valid by not attacking it.

2. ——: EVIDENCE. *Held,* That the testimony failed to show fraud in the transfer of the property from the father to the son.

3. **Married Women.** A married woman may carry on business and make contracts in the same manner as if she were unmarried.

4. **Parent and Child.** An insolvent debtor may emancipate his minor children and relinquish all claim to their earnings, and a creditor will have no claim to the proceeds of their labor.

APPEAL from the district court for Burt county. Heard below before WAKELEY, J.

*Thurston & Hall,* for appellants.

*Charles T. Dickinson,* for appellee, cited: *Thompson v. Loenig,* 13 Neb., 387. *Knowlton v. Hawes,* 10 Neb., 535. Bump Fraudulent Conveyances, 200. *State Bank v. Harrow,* 26 Iowa, 426.

MAXWELL, J.

This is a creditor's bill, brought by the plaintiff against Edwina Young and Andrew Young, to subject certain real estate which, it is alleged, was conveyed to Edwina Young, but in fact belongs to Andrew Young. Cornelia Barnes is a mortgagee of the premises. The plaintiff alleges in her petition that, "at the May term, 1879, of the said district court, the said plaintiff recovered a judgment against the defendant, Andrew Young, for the sum of $1,183.17, the same being a deficiency on confirmation of a sale of mortgaged premises, under a decree of foreclosure of a mortgage in favor of the plaintiff and against the defendants, Andrew Young and Edwina Young, which judgment is now in full force and wholly unsatisfied; that on the 12th day of February, 1884, the plaintiff caused an execution to be issued out of the said court against the property of the defendant, Andrew Young, which execution was by the sheriff of said county returned wholly unsatisfied for want of property whereon to levy; that on the 7th day of May, 1885, the plaintiff caused to be issued out of said court an execution on said judgment against the property of said Andrew Young, and caused

the same to be delivered to the sheriff of said county, who
returned and filed the same with the clerk of said court,
on the 9th day of May, 1885, endorsed as follows: ' In
compliance with the demand herein contained, I did, on
the 8th day of May, A.D. 1885, make diligent search for,
and being unable to find any property of said Andrew
Young, either goods and chattels, or lands and tenements
whereon to levy, I herewith make return this 9th day of
May, 1885.

'ALLEN CROWEN, *Sheriff.*'

"There is now due to the plaintiff on said judgment,
from said defendant, the said sum of $1,183.17, with in-
terest at the rate of twelve per cent per annum from the
5th day of May, 1879; the defendant, Andrew Young, is
insolvent, and has no property liable to execution to satisfy
said judgment; that on the 10th day of October, 1879, the
said defendant, Andrew Young, purchased of one Charles
W. Conkling, by contract, the following described prem-
ises, situated in said Burt county, to-wit: the west half of
section twenty-six in township twenty-two north, of range
nine east, three hundred and twenty acres, for the sum of
two thousand dollars, which said defendant paid as fol-
lows : at date of contract, $200; on or about Dec. 30,
1880, $144; on or about the 19th day of June, 1882, the
balance of the purchase price, with interest, to-wit: the
sum of $——; that said defendant has occupied and
farmed said land continuously since he purchased it in
1879, and has made valuable improvements thereon, and
that the same is now worth a large sum of money, viz.,
$10,000; that the contract as aforesaid for the purchase of
said land, was, by the direction of said Andrew Young,
made in the name of the defendant, Edwina Young, who
is his wife, and that afterwards, to-wit, on the 15th day of
June, 1882, in pursuance of the conditions contained in
said contract, and the request of said Andrew Young, the
said Charles W. Conkling conveyed said premises by war-

ranty deed to said defendant, Edwina Young, in whose
name the fee is now of record ; that the title to said prem-
ises was placed in the name of said Edwina Young, with-
out consideration running from her, and at the special in-
stance and request of said Andrew Young, and that the
same was done for the purpose of hindering and delaying
and defrauding the creditors of said Andrew Young, and
more especially to prevent or hinder this plaintiff from
collecting her judgment as aforesaid, all of which the said
Edwina Young well knew ; that plaintiff did not learn of
the fraud in the purchase and transfer of said premises
until at or about the time of the execution and delivery of
the deed as aforesaid by Charles W. Conkling to said Ed-
wina Young, in 1881 ; the defendant, Cornelia Barnes,
claims an interest in said premises by reason of certain
mortgages, executed in her favor by the defendants,
Andrew Young and Edwina Young ; of the extent of said
interest the plaintiff is not advised." There is an appro-
priate prayer for relief.

The defendants answered separately, and the plaintiff
filed replies, which need not be noticed.

The testimony tends to show that, in the year 1856,
Andrew Young settled on a quarter section of land in Burt
county, being at that time quite poor. He and his family
seem to have been industrious, and in the year 1868 he
possessed two hundred acres of land in Burt county, and
seems to have been in a prosperous condition. The plaint-
iff and her husband also settled in Burt county about the
year 1856, and were possessed of one hundred and twenty
acres of land near or adjoining the farm of Young. In
the spring of 1868 Andrew Young purchased the one
hundred and twenty acres belonging to the plaintiff and
her husband. The exact consideration does not appear from
the testimony, but he and his wife executed a mortgage
for the sum of thirty-five hundred dollars upon the one
hundred and twenty acres purchased from the plaintiff and

her husband, and the two hundred acres possessed by himself, being three hundred and twenty acres in all, the mortgage to draw interest at the rate of 12 per cent. Young seems to have paid the interest on this mortgage for a number of years, but in 1878 an action was brought to foreclose the mortgage, and in April, 1879, a sale was had under the decree, and the three hundred and twenty acres purchased by the plaintiff, the sale confirmed, and a deed ordered and made to the plaintiff, and a deficiency judgment rendered against Andrew Young for $1,183.17. Thus in eleven years the plaintiff had received considerable interest on the mortgage, had recovered the land sold and two hundred acres in addition, with a judgment for more than a third of the original mortgage. To satisfy this deficiency judgment the present action is brought, and it is sought to trace the money of Andrew Young into the purchase price of the land described in the petition. The testimony shows that Andrew Young has four sons. Andrew Young, Jr., became of age in 1876; his services, however, were required on the farm, and he remained until the fall of 1878, upon the promise that he was to be paid twenty dollars per month and board for his labor. He seems to have diligently performed his part of the contract. So far as the testimony shows, the transaction was *bona fide*, and the price paid not being in excess of the value of the services. Soon after this son ceased to perform service for his father he was married, and established a home of his own. The father seems to have turned over to him before that time considerable personal property, including a large number of hogs, and the son borrowed from a neighbor six hundred dollars, which he paid to his father to enable him to pay his debts. At this time there is no pretense that the father was insolvent. The testimony introduced on the part of the plaintiff shows that Andrew Young was an active, enterprising man, who paid his debts, and there is not a scintilla of testimony tending to show

any intention on his part to defraud his creditors.   After
the confirmation of sale under the decree, in the spring of
1879, Andrew Young rented a farm of forty acres, and
as there was not sufficient labor to require the services of
his younger sons, and they being anxious to work for
others, he waived all further claim to their services.   Two
of these sons worked for the neighbors during the summer
of 1879.   In the fall of 1879, the defendant, Edwina
Young, having a promise of two hundred dollars from her
oldest son, was anxious to purchase a home for the family.
Her husband called upon Mr. Conkling, in Tekamah, to
ascertain the price of the land in controversy, which was
held by him at two thousand dollars.   This land is about
four miles east of Oakland, and at that time had about
thirty acres of ground broken up.   The husband and wife
visited the land together, and found it to be suitable for a
home.   The wife then informed Mr. Conkling that she
would take the land on the conditions named.   Mr. Conk-
ling was called as a witness by the plaintiff, and testified
in regard to the payment of the two hundred dollars, as
follows:

Q.   Do you remember who paid the money?

A.   Mrs. Young.

Q.   Do you know how she obtained the money, and if
so, state what you saw or heard?

A.   Andrew Young, Jr., gave it to her in my presence.

Q.   What did he say to her at the time?

A.   He said he would make her a present of that
money, or that he would make her a Christmas present.

Q.   She immediately passed it over to you, did she not?

A.   Yes, sir.

Andrew Young, Jr., testifies in regard to this two hun-
dred dollars, as follows:

Q.   State what you know about the payment of $200,
which was made at the time that the property was pur-
chased, where the money came from, and so on?

A.   I gave her money to make the first payment.

Q.   Where did you get the money?

A.   The money I got off from my farm, which I farmed that year, out of hogs and wheat, and when I got two hundred dollars to spare I gave her two hundred dollars to make the first payment.

Mrs. Edwina Young testified as follows:

Q.   State the circumstances connected with that purchase, and who purchased and paid for it, and all the facts connected with it?

A.   I purchased it, I bought it.

Q.   State all there is about that, who you purchased it of?

A.   Mr. Conkling came down to Arizona, where I was living, and made out a contract, and then it was left in Mr. Lilley's possession until in December, and then I paid him two hundred dollars; Andrew, my son, gave me the two hundred dollars, and I paid it.

Q.   Do you remember how long it was after Mr. Conkling was down on the bottom and made the contract in your house before you paid the two hundred dollars?

A.   That, I think, was in October, and the money was paid in the latter part of December.

Q.   If there is any reason, state why you did not pay that money when he was down and made the contract?

A.   I did not have the money, and my son Andrew told me if I would put it off until that time he would raise the money for me.

Q.   How much was the first payment?

A.   Two hundred dollars.

Q.   State who first talked with Mr. Conkling with regard to the purchase of the land?

A.   Mr. Young talked to him first about it; he had heard me speak about that I wished we had a home again, and so he was out to Tekamah and he met Mr. Conkling, and he had this land to sell.

Q. You may state whether or not you saw Mr. Conkling and talked with him about the purchase of the land before he came down to Arizona?

A. No, I did not.

Q. Do you know where Andrew got that money that he paid to you, and you paid on the land?

A. I do not.

Q. I mean that he gave to you?

A. No, I do not.

Q. State how you have carried on and cultivated and improved the farm on which you now live, that you bought of Mr. Conkling?

A. I do, with my boys' help.

Q. State fully about that?

A. I told them that if they would come out and not go away from home, and come out and work on the farm and help improve it and pay for it, that when it was paid for I would deed them the north 160.

Q. Which two boys do you refer to?

A. Lewis and John.

Q. When did you have that talk with them and agreement in regard to working the place?

A. After I made up my mind to buy it.

Q. Was it before you moved out onto the place?

A. Yes, sir, after I made up my mind to take the piece of land.

Q. After you had talked of buying it and before you bought, you had talked to them?

A. Yes, sir.

Q. What ages were they at that time?

A. I think they were about seventeen and nineteen.

Q. State what has been done in pursuance of that agreement, what they agreed to do, and what has been done under that?

A. They concluded that they would stay and work on the farm and help me pay it and take the land.

Q.   Have they stayed?

A.   Yes, sir, and worked faithfully, too.

Q.   Has this north quarter been improved?

A.   A part of it has been broken up.

Q.   State if you know what contract was made with Mr. Young with the boys as regards giving them their time—emancipating them?

A.   They wanted to be released, and so he gave them their time.

Q.   State, if you know, when that was?

A.   I think it was in the summer of 1879.

Q.   Was that during the time that you were living on the Corbin place?

A.   Yes, sir.

Q.   State what other payments you made on the place up there, before you made this loan from Mr. Wells?

A.   I was not able to pay the first payment, and I sent Mr. Young to see Mr. Conkling about it, and he agreed to wait.

Q.   He sent you a contract?

A.   Yes, sir.

Q.   State, if you know, when you did pay him another payment, about when?

A.   I think it was in the winter of 1882.

Q.   Do you remember when you made the loan from Mr. Wells?

A.   Yes, sir.

Q.   Do you know what date?

A.   Yes, it was June 19th.

Q.   What year?

A.   1882.

Q.   When you say in the winter of 1882, was it before or after you made the loan from Mr. Wells?

A.   It was the winter before the summer.

Q.   State, if you remember, how much you paid at that time?

A. I do not know as I can say exactly; it is on that paper.

Q. You made a payment then, did you?

A. It was interest, I think, for two years instead of one.

Q. Was there any principal paid then?

A. I don't believe there was; I believe it was interest.

Q. Where did that money come from that you paid that interest with?

A. It was the proceeds of the farm.

Q. State when you went upon the farm?

A. I think it was the 23d of March, 1880.

Q. What improvements did you make that year, by the way of breaking?

A. I do not know exactly how many acres we broke up; we broke up a pretty good sized piece; I guess it must have been pretty nearly 80 acres.

Q. Was that cultivated the next year?

A. Yes, sir.

Q. Who has been paying store bills and bills that have been contracted for the family up there since you went up there?

A. I have been paying for them.

Q. Where was the money principally obtained that paid for them?

A. It was some off from the farm and some borrowed.

Q. State, if you know, how much your indebtedness is, outside of the three thousand dollar mortgage on the place?

A. It is a good deal.

Q. State how much it is?

A. It is over two thousand.

Q. State how much your indebtedness is outside of the mortgage indebtedness on the land?

A. I do not know as I can tell exactly, it is over two thousand dollars.

Q. What is that owing for?

27

A.    It is improvements on the farm, and machinery, and different things.

Q.    How large a family had you, how many minor children was there at home at the time that you went into this contract of purchase with Mr. Conkling?

A.    Eight.

Q.    Eight that were not of age?

A.    Yes, sir.

Q.    All living at home?

A.    Yes, sir.

Q.    I believe that you stated that the boys cultivated that farm up there?

A.    Yes, sir.

Q.    State what Mr. Young, your husband, does on the place?

A.    He chores around and makes garden generally, and attends to one thing and another on the yard.

Q.    Does he work out in the field?

A.    No, sir.

Q.    State, if you know, generally how much of the proceeds of the farm go to the support of the family in the way of provisions and clothing? .

A.    I would judge from six to eight hundred dollars.

The Court—You mean cash that you pay out aside from what you raise on the farm and consume there?

A.    Yes, sir.

A. E. Wells, a banker, residing in Oakland, testified that, in June, 1882, he loaned the wife twenty-five hundred dollars to pay the purchase price of the land in question, the remainder to be used in making improvements. He afterwards advanced five hundred dollars more. He says: "I was favorably impressed by the woman, and also with the family; they seemed to be very industrious, so far as they had gone; they had started right on the place, and I took up the contracts and settled with Mr. Conkling, and got my abstract and examined the records

and investigated this matter of the old suit; of course to transact as much business as it is necessary to get at all the facts, I conversed with Mr. Conkling concerning his transactions with Mrs. Young, and even went to Judge Hamilton and consulted with him in the matter of equities, and of husband and wife, and finally made the loan."

But little or none of the principal of these loans has been paid. The testimony shows that Andrew Young is nearly sixty years of age, without means, infirm in health, and apparently discouraged by his misfortunes. In the face of the affirmative testimony showing that the wife purchased the land in question, and has made the improvements thereon, procured loans in her own name, contracted debts on the strength of her being the owner of the property, we are asked to infer that the two hundred dollars paid by Andrew Young, Jr., belonged to his father, and that therefore the land in question is subject to the father's debts. The testimony will warrant no such inference. The positive testimony of the son is, that this money was derived from the sale of his own property, and this is not denied. If, as the plaintiff now claims, Andrew Young, Jr., received property from his father subject to the payment of the father's debts, she should have proceeded against the property of the son, and her assertion that she did not know, is not entitled to much weight. So far as appears, she resided in Burt county, and the testimony of her husband shows that he was diligent in watching the affairs of the Youngs. In any event, the plaintiff treated the transfer to the son, of the personal property referred to in the testimony, as valid, by not attacking it; and after the lapse of nine years this court will not hold such transfer to have been fraudulent and void. It is but just to say, however, that the testimony fails to show that the transfer of the personal property referred to, to the son, was fraudulent as to creditors. A creditor has no claim upon the labor of the wife of an in-

solvent debtor. Under our statute (Comp. Stat., Ch. 53), a wife may carry on business in her own name and enter into contracts in the same manner as if she were unmarried. Neither has a creditor any claim upon the services of minor children of an insolvent debtor, but such father may emancipate his minor children and relinquish all right to their future earnings. *Clemens v. Brillhart*, 17 Neb., 336.

The testimony shows that the farm in question has been cultivated by the minor children of Andrew Young, who had been emancipated by him and all claim to their future earnings relinquished, the mother managing and controlling the business. We are referred to *Thompson v. Loenig*, 13 Neb., 386, as being analogous to that under consideration. An examination of that case, however, will show that the facts are entirely dissimilar to those in this case. The testimony shows that Edwina Young, one of the defendants, has made an heroic effort to provide a home for herself and family, and has struggled against adverse circumstances with commendable zeal. The testimony on the part of the plaintiff tends to show that the family are honest, industrious, and pay their debts as far as they are able, and wholly tends to dispel any inference of fraud or concealment in the dealings with their property. Upon the whole case there is an entire failure of proof to show that Andrew Young has any interest in the land in question, and as the decree in the court below was in favor of the plaintiff, such decree is reversed and the cause dismissed at the cost of the plaintiff.

JUDGMENT ACCORDINGLY.

THE other judges concur.